José Chabrán Gómez, demandante y apelado, *v.* Bull
Insular Line, Inc., demandada y apelante.

Núm. 9680.—*Sometido:* Junio 2, 1948. *Resuelto:* Julio 29, 1948.

270

*Charles R. Hartzell* y *Rafael O. Fernández,* abogados de la apelante; *Bauzá & Bauzá,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

En 1942 José Chabrán Gómez demandó a la Bull Insular Line, Inc. ante el tribunal de distrito en reclamación de salarios. La demanda enmendada alega que el demandante ha trabajado para la demandada en calidad de dependiente desde 1920 hasta el presente; que desde 1935 a 1942 trabajó once horas diarias; y que a tenor con la Ley núm. 49, Leyes de Puerto Rico, 1935, Sesión Extraordinaria (pág. 539), la demandada le adeuda la suma de $3,191.22 por las horas trabajadas en exceso de ocho horas diarias durante dichos años. Después de un juicio en los méritos, la corte inferior dictó sentencia a favor del demandante por la cantidad de $1,079.31. De dicha sentencia la demandada ha apelado.

I

El primer error señalado se dirige a la conclusión del tribunal de distrito al efecto de que la Ley núm. 49 es

aplicable al demandante. Arguye la demandada (a) que la sección 4 dispone que la Ley núm. 49 no será aplicable a un "representante" del patrono; y (b) que el demandante era un "representante" del patrono según se emplea dicho término en la sección 4 y por ende no tenía derecho a acogerse a los beneficios de la Ley. Opinamos que la corte inferior correctamente desestimó estas dos contenciones.

En cuanto al punto (a), la sección 4 dispone que " 'patrono' incluye toda persona natural o jurídica y el administrador, superintendente, capataz, mayordomo y representante de dicha persona natural o jurídica." Pero ésta en manera alguna es una disposición de que la Ley núm. 49 no se aplica a capataces y representantes *como empleados*. La Ley núm. 49 no es una ley de salarios; es un estatuto de horas máximas de trabajo cuyo único fin es limitar las horas de trabajo de un día regular, *Cardona* v. *Corte,* 62 D.P.R. 61, 64. La Legislatura, de haberlo optado así, pudo haber seguido el ejemplo de otras leyes, ora fueren de salario mínimo o como aquí, de horas máximas, o ambas, y pudo haber insertado en la Ley núm. 49 una disposición eximiendo expresamente de sus disposiciones ciertas categorías de empleados. Compárense la sección 13 de la Ley Federal sobre Normas Razonables de Trabajo, 29 U.S.C. sec. 213, eximiendo expresamente de sus disposiciones a los empleados ejecutivos administradores y profesionales como *empleados;* la Ley núm. 379, Leyes de Puerto Rico, 1948 (pág. 1255), que suplantó la Ley núm. 49, y que define la palabra "empleado" y dispone (sección 19) que "la palabra 'empleado' no incluirá ejecutivos, administradores, ni profesionales." Pero la Ley núm. 49 no contiene disposición alguna que exima *empleados* como tales de sus términos o aun que defina la palabra empleados. Por el contrario, dispone de manera abarcadora y sin ninguna excepción en su sección 1 que "*a ninguna persona* se le empleará o se le permitirá que trabaje

en ningún establecimiento comercial, industrial, agrícola o en cualquier otro negocio lucrativo, más de ocho (8) horas durante cualquier día natural . . . ''. (Bastardillas nuestras). De su faz esta disposición incluye a todos aquéllos que son empleados, sean o no ''representantes'' del patrono.

Surge entonces la pregunta—¿Si un representante es un *empleado,* por qué la Legislatura también define en la sección 4 al representante como un *patrono?* La contestación es obvia. La Ley núm. 49 no sólo establece el día de ocho horas y paga doble por la novena hora. También provee sanciones penales en su sección 8 por infracciones de la Ley núm. 49. *Cardona* v. *Corte,* supra. Pero si las sanciones penales se hubieran establecido únicamente contra los dueños de los establecimientos, habría sido fácil para los patronos evadirlas, escudándose en la ficción de que el capataz o el representante, y no el patrono, habían permitido que se trabajara en exceso de ocho horas. En su consecuencia, la palabra ''patrono'' se definió en la sección 4 para que incluyera a los capataces o representantes, de suerte que fuera más difícil para los patronos evadir la Ley: un capataz o representante no estaría dispuesto a afirmar falsamente que él había permitido que se trabajase en exceso de ocho horas, en contra de las órdenes del patrono, si sabía que iría a la cárcel por ello. Es cierto que en virtud de la sección 4 esta disposición convierte a un capataz o representante en ''el patrono'', desde el punto de vista de los hombres que trabajan bajo sus órdenes. En verdad, hemos sostenido la convicción de un capataz bajo esa teoría a tenor con la sección 8 de la Ley núm. 49. *Pueblo* v. *Soler,* 62 D.P.R. 673. Pero un capataz o representante, en lo que concierne a sus propios intereses, es un empleado frente al dueño del establecimiento, que es el verdadero patrono. Y la inclusión en la sección 4 de los capataces y ''representantes'' como *patronos,* con el fin de evitar que se burlara la sección 1 y para poner en vigor efectivamente la sección 8,

en forma alguna equivale a una exención específica, haciendo que las disposiciones de la Ley núm. 49 no sean aplicables a los capataces y representantes como empleados.([1])

En su argumentación sobre el punto (a), la demandada también descansa en testimonio al efecto de que al entrar en vigor en 1935 la Ley núm. 49, el Comisionado del Trabajo informó a las varias compañías navieras en una reunión que la Ley no era aplicable a los dependientes de esta categoría porque éstos eran representantes de la compañía. Presumimos que el Comisionado tenía poder para hacer interpretaciones administrativas de la Ley núm. 49, que originó en su departamento, *Cardona* v. *Corte,* supra, págs. 64–5, escolio 1, y que mediante la sección 5 venía obligado a poner en vigor. Y suponemos que esta manifestación verbal hecha por el Comisionado en una reunión informal constituyó una interpretación o reglamento administrativos. *Cordero* v. *Prensa Insular de Puerto Rico, Inc.,* 169 F.2d 229, (C.C.A. 1, julio 23, 1948); *Liggett & Myers Tobacco Co.* v. *Buscaglia, Tes.,* 64 D.P.R. 78, confirmado en 149 F.2d 493 (C.C.A. 1, 1945). Sin embargo, ningún reglamento puede infringir las claras disposiciones de un estatuto. Los reglamentos pueden llenar pequeñas lagunas en una ley, proporcionar detalles en cuanto a su funcionamiento o esclarecer dispo-

---

([1])Un problema similar surge de las definiciones de patrono y empleado contenidas en la Ley de la Junta de Relaciones del Trabajo de Puerto Rico, artículo 2 de la Ley núm. 130, Leyes de Puerto Rico, 1945 ((1) pág. 407), según fué enmendada por la Ley núm. 6, Leyes de Puerto Rico, 1946 ((1) pág. 19). Aquí también el término "patrono" aparece definido en el artículo 2 incluyendo "ejecutivo, supervisores y a cualquier persona que realizare gestiones de carácter ejecutivo en interés de un patrono directa o indirectamente . . . ". Pero esta disposición sólo convierte a un supervisor en "patrono" en sus relaciones con otros empleados subalternos. Para determinar si un supervisor es en sí un empleado a los fines de esta Ley, debemos ir a la definición de un empleado. El inciso 3 dispone que "el término 'empleado' incluirá a cualquier empleado, y no se limitará a los empleados de un patrono en particular, a menos que la ley explícitamente lo exprese en contrario . . . El término no incluirá ejecutivos ni supervisores." De esto vemos que la Legislatura expresamente eximió a los "ejecutivos o supervisores" del término empleado usado en esta Ley; pero no hizo tal disposición en la Ley núm. 49.

siciones dudosas o ambiguas. *Puerto Rico Ilustrado* v. *Buscaglia, Tes.,* 64 D.P.R. 914, 937-8. Pero "Cuando un estatuto es claro ningún [individuo interesado] puede refugiarse en la interpretación administrativa o en un reglamento en contrario." Idem, pág. 937. Una interpretación o reglamento administrativos que, como ocurre en este caso, están en conflicto con las expresas disposiciones de una ley, no pueden subsistir. *Colón* v. *Tugwell, Gobernador,* 65 D.P.R. 924, 927. En la sección 4 la Legislatura no eximió a los "representantes" en su calidad de *empleados* de los términos de la Ley núm. 49. Por consiguiente, el Comisionado del Trabajo no tenía autoridad para conferir tal exención cuando ésta no estaba provista en la Ley.

En cuanto al punto (*b*), aun cuando interpretásemos que la sección 4 de la Ley núm. 49 dispone una exención a los "representantes" de un patrono de los beneficios de la Ley núm. 49, creemos que la corte inferior actuó correctamente al resolver que el demandante no era un representante dentro del alcance de dicha sección 4. Literalmente hablando, cada empleado "representa" a su patrono cuando se dedica al cumplimiento de sus deberes. Pero nadie asume la absurda posición de que todos los empleados están exentos de los términos de la Ley núm. 49 en virtud de la sección 4. Es obvio que según aparece la palabra en dicha sección un representante no es un empleado que desempeña labor manual u oficinesca rutinaria. Más bien es un individuo que actúa y habla por el patrono sobre cuestiones que requieren el uso de discreción. Por ejemplo, un empleado que tiene otros empleados trabajando bajo sus órdenes y a quienes puede contratar y despedir, probablemente caería en esta categoría.

¿Era Chabrán un representante de la compañía a este respecto? El contralor de la compañía declaró lo siguiente: "P.—¿En qué forma representaba Chabrán a la Compañía? R.—Él representaba a la Compañía, si estaba trabajando,

entregando carga. Él firmaba un documento en representación de la compañía en el sentido de que estaba entregando al consignatario. Él firmaba como que le había sido entregado por la compañía. Si trabaja recibiendo carga, el señor Chabrán firmaba un documento o recibo de muelle el cual comprometía a la compañía en cuanto a la custodia de esa mercancía que había sido recibida en buenas condiciones, y si la recibía en malas condiciones, ponía una nota al efecto. De modo que él obligaba a la compañía con respecto a dicha mercancía.''

La manifestación de que Chabrán ''representaba'' a la compañía era una conclusión legal que ni la corte inferior ni este tribunal tienen la obligación de hacer suyas. Aceptamos la evidencia en cuanto a los hechos, pero llegamos a nuestras propias conclusiones legales en cuanto a si estos hechos exigen que se resuelva que Chabrán era un representante, según aparece dicho término de la sección 4.

Al sostener que el demandante era su representante, la demandada enfatiza el hecho de que la firma del demandante en relación con la carga obligaba a la compañía. Es cierto que ésta es responsable por los actos del demandante al manejar la carga y firmar por ella. Pero un patrono es responsable civilmente si su chófer, en el cumplimiento de sus deberes, da muerte a una persona, o si un mensajero corriente no cumple con su deber de recibir y entregar mercancía. La fórmula no es si el patrono responde o no por los actos del empleado. Más bien, según hemos visto, es la naturaleza de los deberes del empleado y sus responsabilidades en el uso de discreción a nombre del patrono.

El demandante no tenía autoridad para contratar o despedir otros empleados; es más, nadie trabajaba bajo sus órdenes y no tenía autoridad para darle órdenes a los obreros. Su único papel era cotejar la carga que entraba y salía del muelle. El superintendente y el capataz estaban a cargo de cargar y descargar los barcos. En la Parte II la

compañía sostiene' que la reclamación aquí envuelta estaba prescrita porque Chabrán no era un empleado permanente y sólo trabajaba cuando la compañía le notificaba que había trabajo para él en el muelle. Esta clase de empleados difícilmente cae en la categoría de representante que la sección 4 define como *patrono*. Como cuestión de hecho, como nadie trabajaba bajo sus órdenes, Chabrán no era ni siquiera un "representante" a tenor con la teoría expuesta en el punto (*a*) de que tales empleados pueden ser enjuiciados como patronos en virtud de la sección 8 por infracciones a la Ley núm. 49.

El tribunal de distrito no cometió error al resolver (*a*) que la sección 4 no dispone que la Ley núm. 49 no se aplica a un "representante" de un patrono; y (*b*) que aun cuando la sección 4 así lo proveyera, el demandante no es un "representante" según aparece dicho término en la sección 4.

## II

■ La demandada señala como segundo error el no haber el tribunal inferior resuelto que la reclamación del demandante por salarios correspondientes al período anterior a junio 30, 1939 estaba prescrita, debido a la forma en que se prestaban y pagaban los servicios del demandante.

El artículo 1867 del Código Civil, luego de fijar un término prescriptivo de tres años para las acciones de los obreros en reclamación de salarios, dispone que el "tiempo para la prescripción . . . se contará desde que dejaron de prestarse los respectivos servicios."

El contralor de la compañía declaró que el empleo de Chabrán no era "permanente", sino que trabajaba solamente cuando se necesitaba. El demandante también declaró que trabajaba únicamente cuando la compañía se lo notificaba. Por consiguiente, ésta arguye que Chabrán no venía obligado a trabajar continuamente para ella, sino que trabajaba por día cuando lo necesitaban; que su trabajo se consideraba terminado en cualquier día de la semana, de-

pendiendo del trabajo disponible; y que cuando se le pagaba por su trabajo, Chabrán no tenía seguridad de que volvería a trabajar, de suerte que su empleo terminaba cada vez que se le pagaba. La demandada entonces sostiene que bajo estas circunstancias el demandante "dejó de prestar los respectivos servicios" cada vez que se le pagaba por el trabajo realizado; y toda vez que la demanda fué radicada el 30 de junio de 1942, la reclamación por trabajo realizado antes de junio 30, 1939 había prescrito a tenor con el artículo 1867.

La conclusión del contralor al efecto de que Chabrán no era un empleado "permanente" de la compañía no está sostenida por los hechos. El tribunal de distrito resolvió que Chabrán trabajó como sigue: En 1935, alrededor de 3½ días semanalmente; en 1936, un promedio de 5½ a 6 días a la semana; en 1937, casi siempre seis días a la semana; en 1938, un promedio de 5½ días a la semana; en 1939, un promedio de 4½ a 5 días semanalmente; en 1940 un promedio de 5½ a 6 días a la semana; en 1941, un promedio de 6 días a la semana; en 1942, un promedio de 6 días a la semana. Esta conclusión está sustancialmente sostenida por los libros de la compañía, que demuestran que Chabrán trabajó como sigue: En 1936, 261 días, incluyendo 56 "medias noches", faltando los records de siete semanas; en 1937, 287 días, incluyendo 112 medias noches, faltando records de cuatro semanas; en 1938, 246½ días, incluyendo 74 medias noches; en 1939, 246 días, incluyendo 105 medias noches; en 1940, 283½ días, incluyendo 118 medias noches; en 1941, 309½ días, incluyendo 140 medias noches; en 1942, hasta junio 26, 152 días, incluyendo 77 medias noches.

No nos detenemos a investigar si prevalecería la teoría de la compañía si Chabrán hubiera trabajado sólo ocasionalmente para la compañía por un período de años. Tampoco determinamos si esta contención tendría éxito en relación con un empleado que como estibador trabajó una gran

parte del año pero pasó de compañía en compañía según hubiera trabajo. Véase *Bay Ridge Operating Co., Inc.* v. *Aaron et al.,* 334 U.S. 446, resuelto el 7 de junio de 1948. Aquí, Chabrán trabajó para la demandada continuamente, no intermitentemente, desde el 1920 al 1942. Cierto es que no trabajó todos los días de la semana. Pero siempre que había trabajo, era notificado de ello y trabajaba. Esto incluía muchos domingos, noches y días feriados. Si los records demostraran que sólo trabajó un día o dos a la semana para la compañía, quizás tendríamos ante nos una cuestión diferente. Pero si los records de trabajo de Chabrán desde 1935 a 1942 no demuestran un empleo regular y continuo de dicho empleado por parte de la compañía, nos es difícil imaginarnos un caso en que un empleado que recibe paga por hora o por día pueda incluirse en esa categoría. No podemos concluir que el contralor correctamente caracterizó a Chabrán como un empleado no permanente, frente a los propios records de la compañía.

Con estos hechos ante nos, las reglas que hemos establecido en nuestros casos no prescriben la reclamación del demandante por el trabajo realizado más de tres años antes de la fecha de la radicación de la demanda. En *Muñoz* v. *Corte,* 63 D.P.R. 236, resolvimos que a tenor con el artículo 1867 el período prescriptivo empezó a correr desde la fecha en que el obrero abandonó su empleo, y no como alega la demandada aquí desde la terminación de cada semana cuando se le pagó al empleado su salario. Y al declarar sin lugar la moción de reconsideración, rechazamos la contención de que cuando los servicios, como ocurre en este caso, son contratados por un período indefinido con paga semanal, existe la presunción de que el contrato expira semanalmente, empezando la prescripción con cada pago semanal.

En el caso de *Jiménez* v. *Corte,* 65 D.P.R. 37, dijimos que bajo el caso de *Muñoz* el empleado debe prestar sus servicios ininterrumpidamente. Pero dijimos (pág. 41) "No

estamos resolviendo que cada interrupción de servicio inicia la prescripción para servicios anteriores. . . . Acontecimientos tales como una breve enfermedad del obrero, rotura de la maquinaria o *escasez temporal de trabajo,* no darían lugar a este resultado." (Bastardillas nuestras). Aquí Chabrán trabajó regularmente durante años para la compañía. Ocasionalmente dejaba de trabajar un día, sólo por "escasez temporal de trabajo". Por tanto, tales interrupciones no dieron comienzo, bajo el caso de *Jiménez,* al período prescriptivo. Véase también, *Valiente & Co.* v. *Corte,* 68 D.P.R. 529.

El tribunal de distrito no cometió el segundo error. Resolvió correctamente que bajo el artículo 1867 la manera en que el demandante desempeñó su trabajo y se le pagó por el mismo, no produjo la prescripción de las reclamaciones por trabajo realizado más de tres años antes del día en que se radicó la demanda.

## III

■■ En su tercer señalamiento la demandada impugna la conclusión de la corte de distrito al efecto de que el término prescriptivo no empezó a correr desde el 1 de enero de 1938 con referencia a las reclamaciones por trabajo realizado antes de dicha fecha. La teoría de la compañía es que la prescripción empezó el 1 de enero de 1938 por haber entrado en vigor un nuevo contrato entre las partes.

El 3 de enero de 1938 los empleados de la compañía, el demandante inclusive, así como los empleados de las demás compañías navieras, declararon una huelga. El 10 de febrero de dicho año, los obreros, por su unión, y las compañías navieras, firmaron un acuerdo de someter la controversia a una Junta de Arbitraje, retornando los obreros al trabajo el 12 de febrero. El 26 de mayo de 1938, la Junta de Arbitraje emitió una opinión y un laudo que disponía que el laudo tendría el mismo efecto de un convenio colectivo, por el término de un año desde el 1 de enero al 31 de di-

ciembre de 1938, entre las compañías y los obreros envueltos, con el mismo resultado que si las partes hubieran otorgado tal convenio el 1 de enero de 1938. Ambas partes aceptaron el laudo. Por consiguiente, las condiciones de trabajo y los salarios fijados en el laudo fueron cumplidos durante 1938.

Convenimos con la compañía en que bajo las circunstancias de este caso el laudo de arbitraje, al tratarse como un convenio colectivo por un año, era completamente un nuevo arreglo entre ella y sus empleados, que puso fin a todos los arreglos existentes y dió comienzo a un nuevo período de servicios. Toda vez que el nuevo contrato empezó a regir el 1 de enero de 1938, el término prescriptivo empezó a correr en dicha fecha para reclamaciones por trabajo realizado antes de dicho día.

El lenguaje empleado en el caso de *Muñoz* v. *Corte,* supra, es de aplicación a esta situación. En dicho caso dijimos a la pág. 248:

"Pero al aprobarse en el siglo diecinueve el Código Civil español, sus autores se dieron cuenta de que al variar la naturaleza de los servicios que venía prestando el obrero, se operaba una novación que extinguía el contrato anterior para dar paso a un nuevo contrato. Estas consideraciones sin duda los movieron a restringir el alcance de la ley de la Novísima Recopilación, *de suerte que el período prescriptivo se contase a partir de la terminación de cada contrato sin tener en cuenta que el obrero continuase al servicio del mismo patrono,* y llevando a cabo su propósito dispusieron en el último párrafo del artículo 1867 del Código Civil:

" 'El tiempo para la prescripción de las acciones a que se refieren los tres párrafos anteriores se contará desde que dejaron de prestarse los *respectivos* servicios.' " (Primeras bastardillas nuestras).

En el caso de *Jiménez* resolvimos que (pág. 41) "cuando un querellante abandona el trabajo *por meses* o años en una industria que funciona todo el año, y no se ofrece una *explicación* para ello, el obrero cesa en dicho momento de rendirle servicios al patrono dentro del significado del artículo

1867." (Bastardillas nuestras). Y continuamos indicando que (págs. 41-2) "Es inmaterial el hecho de que el obrero pueda volver y vuelva donde el mismo patrono y realice el mismo trabajo de conformidad con el mismo arreglo. Cuando el obrero rompe el arreglo anterior, el estatuto prescriptivo por sus propios términos empieza a correr en cuanto a todos los servicios anteriores."

En este caso la explicación para la interrupción de los servicios fué una huelga de seis semanas y un nuevo contrato, conteniendo nuevas condiciones de trabajo y de salario para toda la industria. Pero ésta no es la clase de "explicación" contemplada por el caso de *Jiménez*, donde la enfermedad del obrero, la rotura de la maquinaria, o la escasez temporal de trabajo se muestran como ejemplos de las explicaciones suficientes para impedir la prescripción. Ninguno de estos ejemplos envuelve acción voluntaria por parte del empleado. Aquí Chabrán voluntariamente dejó el empleo de la demandada porque no estaba conforme con los términos de su empleo. Luego de transcurrido mes y medio, retornó a su trabajo bajo un nuevo contrato. Es cierto que en su caso específico el único cambio efectuado fué un aumento en su salario de un 25 por ciento. Pero el nuevo contrato realizó un número de cambios sustanciales en las condiciones de trabajo de los empleados y funcionamiento de la industria. La combinación de la interrupción de servicios durante mes y medio y del nuevo contrato nos convencen de que en este caso específico el término prescriptivo, en virtud del lenguaje que acabamos de citar de los casos de *Muñoz* y de *Jiménez*, empezó a correr desde el 1ro. de enero de 1938, fecha del nuevo contrato, por reclamaciones de trabajo realizado con anterioridad a dicha fecha.

Al concluir lo contrario, el tribunal de distrito descansó en una manifestación hallada en *Avellanet* v. *Porto Rican Express Co.*, 64 D.P.R. 693, 699, al efecto de que "por lo menos debe haber un cambio efectivo en la clase de trabajo

realizado por el empleado." Pero este lenguaje se empleó en relación con la situación específica de dicho caso. Allí se hizo la reclamación de que el término prescriptivo empezó a correr por el único motivo de que el empleado, un oficinista que había estado recibiendo y despachando carga local, empezó a manejar carga dentro del comercio interestatal después de haber entrado en vigor la Ley Federal sobre Normas Razonables de Trabajo. Resolvimos que esto no fué un cambio en la naturaleza de sus servicios, toda vez que continuó haciendo exactamente el mismo trabajo que siempre había hecho. Pero el caso de *Avellanet* no envolvía el efecto de un nuevo contrato. Así lo hicimos constar claramente cuando dijimos que (pág. 699) "Nada hay en el récord que demuestre (*a*) bien que el trabajo de un oficinista en carga interestatal es diferente a las mismas funciones realizadas en carga local, o (*b*) que las partes por sí mismas—sin hacer referencia a la nueva Ley Federal—llegaron a un nuevo convenio contractual." La diferencia existente entre este caso y el de *Avellanet* es precisamente que aquí ocurrió la situación (*b*): las partes, luego de una interrupción de los servicios durante seis semanas motivada por una huelga, realizaron entre sí un nuevo convenio contractual.

Chabrán alega y la corte de distrito así lo resolvió, que el estimar la interrupción de los servicios causada por una huelga como que da comienzo al período prescriptivo, sería menoscabar el derecho de huelga. No estamos conformes. En primer lugar, notamos que bajo los hechos de este caso el nuevo contrato, junto a la interrupción causada por la huelga, más bien que ésta solamente, comenzó el término prescriptivo. Pero lo más importante es que no encontramos incompatibilidad entre el derecho de huelga y la regla que aquí establecemos.

En el caso de *Jiménez* indicamos que (pág. 42) "Como dijimos en el caso de *Muñoz* al resolver la moción de recon-

sideración (pág. 245) el estatuto, en su funcionamiento práctico, es altamente irrazonable. No lo haremos más irrazonable tergiversando sus claras disposiciones . . . ''. Nos referíamos al lenguaje del caso de *Muñoz* que se encuentra a la pág. 249:

*"Los modernos medios de defensa de que en el presente dispone el obrero para defender sus derechos,* hacen innecesario para él y quizás injusto para el patrono mantener a este último sujeto a la amenaza de una reclamación de salarios por todo el tiempo que pueda durar un contrato de servicios sin término definido y hasta tres años después de haberse dejado de prestar los respectivos servicios. En muchos casos el patrono corre el riesgo de perder la evidencia que hubiera podido usar en su defensa si el pleito contra él se hubiera presentado dentro de un plazo razonable; en otros, puede crecer a tal extremo el montante de la reclamación que la sentencia que lo condene a pagarla pueda producir su ruina económica. Pero esas consideraciones, lógicas y justas como son, deben ser sometidas a la Asamblea Legislativa y no a los tribunales, a quienes les está vedado pasar sobre la bondad y sabiduría de las leyes." (Bastardillas nuestras).

La teoría fundamental en la cual está predicado el artículo 1.867—que un empleado estará temeroso de demandar a su patrono mientras permanece en su empleo—es anticuada, por lo menos cuando, como aquí ocurre, una poderosa unión representa a los empleados al negociar convenios colectivos con el patrono. Tomamos conocimiento judicial de que la huelga de seis semanas aquí envuelta paralizó casi toda la actividad económica en esta isla, que depende para su existencia de la industria naviera. El demandante y sus compañeros tenían un derecho incondicional de irse en huelga. Pero nadie que la observó puede razonablemente decir que indicó timidez y miedo por parte de los empleados hacia sus patronos.

En muchos casos esta teoría no puede subsistir a la luz de condiciones modernas bajo las cuales (1) el trabajo organizado mediante las uniones celebra convenios colectivos con los patronos, con frecuencia, como aquí, sobre una base

de todos los patronos en una industria específica; (2) el Departamento del Trabajo Insular, mediante su Servicio de Conciliación y de sus abogados que llevan los pleitos privados a nombre de los obreros, protege los derechos de estos últimos; (3) una Junta de Salario Mínimo establece el salario mínimo, las horas máximas y las condiciones de trabajo para todos los patronos de determinadas industrias; (4) existen juntas Federales e insulares para evitar prácticas ilícitas de trabajo por parte de los patronos; (5) las leyes Federales e insulares disponen que será delito el que un patrono despida o discrimine en forma alguna contra un empleado porque éste demande al patrono en reclamación de salarios, 29 U.S.C. sec. 215(a)(3); artículo 18, Ley núm. 379, Leyes de Puerto Rico, 1948.(²)

En este mismo caso, el demandante no ha creído necesario esperar hasta abandonar el empleo de la compañía para demandar a ésta en reclamación de sus salarios. Este pleito se radicó en 1942. Se celebró el juicio en 1945. Sin embargo, el demandante ha trabajado para la compañía desde el 1920 hasta el presente.

. El Congreso ha optado quitarle a la Ley local la cuestión de la prescripción de reclamaciones bajo las Leyes sobre Normas Razonables de Trabajo. Y al así hacerlo reconoció que, en vista de todas las salvaguardas que ahora rodean al obrero, no hay necesidad de un término prescriptivo que comience a correr solamente después que el obrero deja de trabajar para el patrono, fecha que puede ser 20 ó 30 años después de tener derecho a la supuesta reclamación. Ha provisto un término prescriptivo de dos años después

(²)Nos damos cuenta de la posibilidad de que en casos adecuados, tanto bajo la Ley de Relaciones del Trabajo Federal como de la insular, podría resolverse que los empleados en huelga o los despedidos, nunca ''dejaron'' el trabajo de un patrono a quien se declara culpable de prácticas ilícitas del trabajo. Pero el retener el *status* de empleado no obstante declararse en huelga o haber sido despedido por dedicarse el patrono a prácticas ilícitas del trabajo, emana de leyes positivas no aplicables a este caso y que tienen por miras subsanar males que en manera alguna están relacionados con el problema aquí envuelto cual es el de una prescripción indefinida y prolongada.

de tener derecho a la causa de acción. Sección 6 de la Ley de Portal a Portal, 61 Stat. 84; véase Romanacce, *The Portal to Portal Act of* 1947, XI Revista de Derecho, Legislación y Jurisprudencia del Colegio de Abogados de Puerto Rico 87, 103–5.

Además, aparte del hecho de que ya en muchos casos no existe la necesidad para ello, es ilusorio creer que los costos envueltos en conservar reclamaciones viejas pendientes durante muchos años son de los patronos exclusivamente. Confrontado con tal situación, ningún patrono absorbe tales costos. Separa reservas o usa otros métodos de negocio que le permiten pasarle estos costos al público en general. Y es difícil ver la justificación que existe para exigirle al público que pague por tan irrazonable término prescriptivo.

Parafraseando nuestro lenguaje del caso de *Jiménez* a la pág. 42, no haremos este irrazonable estatuto aun más irrazonable tergiversando sus claras disposiciones. El derecho de huelga no tiene relación alguna con el artículo 1867. Los empleados pueden declararse en huelga. Pero si lo hacen y ganan la huelga, obteniendo con ello un nuevo contrato de servicios, no procede la contención de que los servicios anteriores no fueron terminados. El artículo 1867 de su faz se aplica a aquellos hechos y prescribe reclamaciones por trabajo realizado con anterioridad a un nuevo contrato otorgado bajo estas circunstancias. No vemos motivo para hacer un esfuerzo con el fin de evitar cumplir con sus disposiciones y con ello hacer del estatuto uno más irrazonable de lo que exigen sus disposiciones.

El tribunal de distrito cometió el tercer error al negarse a resolver que bajo los hechos de este caso el término prescriptivo de tres años empezó a correr el 1ro. de enero de 1938 para reclamaciones por trabajo realizado con anterioridad a dicha fecha, y en su consecuencia, estaban prescritas por no haberse radicado la demanda hasta el 30 de junio de 1942.

## IV

■ El cuarto señalamiento es que el tribunal inferior cometió error al no resolver que las reclamaciones por trabajo realizado con anterioridad al 1ro. de enero de 1939 habían prescrito, porque el término prescriptivo de tres años empezó a correr en dicha fecha para las reclamaciones por trabajo realizado con anterioridad a la misma, en vista del hecho de haber entrado en vigor ese día un nuevo contrato.

El laudo arbitral disponía que el convenio en él establecido terminaría el 31 de diciembre de 1938. En ese laudo, no se cambiaron las horas de trabajo para dependientes como Chabrán. Sólo disponía que recibirían un aumento de 25 por ciento en su salario. Y la Ley sobre Normas Razonables de Trabajo, que disponía salarios mínimos y fijaba una semana máxima de trabajo, no empezó a regir hasta octubre de 1938.

El 30 de diciembre de 1938 la compañía expidió un aviso impreso ''A los Estibadores y Dependientes de San Juan y la Isla de Puerto Rico''. Este aviso decía que '' . . . desde enero 1 hasta diciembre 31, 1939 . . . 1. La Compañía continuará poniendo en vigor las cláusulas a favor de los trabajadores, del laudo del Comité de Arbitraje que ha regido durante el año 1938. 2. La Compañía continuará pagando los mismos salarios que ha pagado durante el año 1938. . . . 5. Se cumplirá al pie de la letra la Ley de Horas y Salarios a favor de todo el personal tanto del muelle como de la oficina.'' El aviso también disponía lo siguiente:

''A todos los dependientes se les ha favorecido en los salarios a ganar de acuerdo con las horas que trabajen.

''El personal empleado como dependientes . . . se les pagará en la forma siguiente: .

''1. $3.75 por día laborable y $5.00 por día festivo.

''2. Un día laborable constará de ocho horas dividido de 8:00 A.M. a 12:00 M.D. y de 1:00 P.M. a 5:00 P.M.

Cualquier fracción del tiempo que se trabaje de 8:00 A.M. a 12:00 M.D. y de 1:00 P.M. a 5:00 P.M. será considerado como medio día de trabajo.

"4. El trabajo realizado fuera de las horas regulares se pagará a razón de 62 cts. la hora, disponiéndose que cualquier trabajo realizado de 6:00 P.M. a 8:00 A.M. si se trabajan más de dos horas, se pagará un mínimum de $2.50.

"5. Cualquier tiempo que se trabaje en exceso de las 44 horas durante una semana de trabajo o sea desde el sábado al viernes, el exceso de horas se pagará a razón de 70 cts. la hora, o sea, tiempo y medio."

La demandada alega que mediante este aviso se dispuso por primera vez (1) que a todos los dependientes se les pagaría "de acuerdo con las horas que trabajen"; (2) que un día laborable para los dependientes constaba de ocho horas; y (3) que las horas trabajadas en exceso de las 44 horas semanales serían pagadas a tiempo y medio. Por consiguiente, la compañía sostiene que estas nuevas condiciones trajeron como resultado un nuevo contrato a partir del 1ro. de enero de 1939 y que por los motivos expuestos en la parte III, el 1ro. de enero de 1939 el término prescriptivo empezó a correr para todas las reclamaciones por trabajo realizado con anterioridad a dicha fecha.

La contención de la compañía tendría más fuerza si las partes hubieran negociado y otorgado un nuevo convenio colectivo. Pero el mero anuncio por la compañía de que estaba reajustando su estructura de horas de trabajo y de salarios para cumplir con la nueva Ley Federal, no hizo aplicable la regla establecida en la Parte III con refrencia al artículo 1867. Según dijimos en el caso de *Avellanet* por lo menos debe haber alguna evidencia de (pág. 699) "que las partes por sí mismas—*sin hacer referencia a la nueva Ley Federal*—llegaron a un nuevo convenio contractual." (Bastardillas nuestras). Es cierto que el día de ocho horas, no exigido por la Ley Federal, fué establecido para los dependientes por primera vez en este aviso. Pero el artículo 1867, según interpretado en los casos de *Muñoz, Ji-*

*ménez* y *Avellanet,* no puede ser interpretado como que significa que tal pequeño cambio en las relaciones existentes entre las partes, dió comienzo al término prescriptivo.

El tribunal de distrito no cometió el cuarto error al negarse a resolver que las reclamaciones por trabajo realizado con anterioridad al 1ro. de enero de 1939 estaban prescritas en la teoría de que (1) en dicha fecha se llegó a un nuevo contrato, (2) en consecuencia el término prescriptivo empezó a correr ese día, y (3) el término prescriptivo de tres años ya había expirado al radicarse la demanda el 30 de junio de 1942.

## V

El quinto señalamiento está dirigido contra la resolución del tribunal de distrito al efecto de que la Ley núm. 49 de 1935 ((2) pág. 539) continuó en vigor después de haber el Congreso aprobado la Ley sobre Normas Razonables de Trabajo de 1938.

Sostiene la demandada que aun cuando no exista conflicto entre la Ley núm. 49 y la Ley Federal, el Congreso ha ocupado todo el campo de horas y salarios para empleados de las compañías que, como la demandada, se dedican al comercio interestatal, y, por consiguiente, ha suplantado tales leyes locales como la núm. 49.

En igual forma que la Enmienda Décimocuarta y las cláusulas de privilegios y de inmunidad de la Constitución, la cláusula de comercio no es aplicable a Puerto Rico porque éste no es un Estado sino un territorio organizado no incorporado a los Estados Unidos. *Ballester Hnos.* v. *Tribunal de Contribuciones,* 66 D.P.R. 560, Parte II, revocado por otros motivos pero aprobado en cuanto a este punto, en 162 F.2d 805 (C.C.A. 1, 1947), *cert.* denegado 332 U.S. 816; *South Porto Rico Sugar Co.* v. *Buscaglia,* 154 F.2d 96, 101 (C.C.A. 1, 1946); *Buscaglia* v. *Tribunal de Contribuciones; Pérez Vahamonde, Interventora,* 68 D.P.R. 345, y casos allí citados. De acuerdo con estos casos y el

de *Puerto Rico* v. *Shell Co.*, 302 U.S. 253, podría argüirse que la cláusula de comercio no impide legislación insular sobre la misma materia cubierta por la Ley sobre Normas Razonables de Trabajo. Pero el Congreso optó en la sección 3(c) de la Ley Federal, 29 U.S.C. sección 203(c), por disponer que " 'Estado' significa cualquier Estado de los Estados Unidos o el Distrito de Colombia o cualquier territorio o posesión de los Estados Unidos." Por tanto, tratamos el caso como si hubiera surgido en uno de los Estados.

Recientemente dijimos en *Ávila* v. *Corte,* 68 D.P.R. 11, 17, que "En ausencia de una prohibición específica en una ley Federal contra legislación local, el Gobierno insular puede ejercer poderes concurrentes aprobando, bajo su poder de policía, legislación que cubra la misma materia, siempre y cuando que ésta no esté tan íntimamente mezclada y relacionada con responsabilidades del gobierno nacional, que su propia naturaleza de por sí haga surgir la inferencia de que se trata de un asunto que compete exclusivamente al gobierno nacional. *Bethlehem Co.* v. *State Board*, 330 U.S. 767, 772; *Hines* v. *Davidowitz,* 312 U. S. 52, 66; *Hill* v. *Florida,* 325 U.S. 538, 542; Grant, *The Scope and Nature of Concurrent Power,* 34 *Col.L.Rev.* 995."

La Corte Suprema ha indicado que "como cuestión de interpretación estatutaria la intención del Congreso para suplantar legislación local en el ejercicio de su poder de comercio, no debe, en general, inferirse a no ser que esté claramente indicada por aquellas consideraciones persuasivas del propósito estatutario." *Maurer* v. *Hamilton,* 309 U.S. 598, 614; *H. P. Welch Co.* v. *New Hampshire,* 306 U.S. 79; *S. C. Hwy. Dept.* v. *Barnwell Bros.,* 303 U.S. 177.

En el caso de *Ávila* continuamos diciendo que (págs. 17-8) "El control de alquileres no es tan exclusivamente una responsabilidad nacional, que su materia como tal requiera que resolvamos que el Congreso, una vez que legisla sobre ella, intenta ocupar el campo exclusivamente, a pesar de

que el estatuto Federal no prohibe específicamente un estatuto local sobre el mismo asunto," citando entre otros casos, *Panhandle Pipe Line Co.* v. *Comm'n.*, 332 U.S. 507. Llegamos al mismo resultado con referencia a horas y salarios de patronos dedicados al comercio interestatal. El Congreso no se apropió exclusivamente el campo de las normas a fijarse en relación con horas y salarios de empleados que trabajan en el comercio interestatal. Pudo haber prohibido legislación local sobre cualquier aspecto de la materia. Véase *Latoni* v. *Corte,* 67 D.P.R. 140. Pero en vez de prohibir las leyes locales, el Congreso afirmativamente dispuso, quizá por exceso de precaución, en la sección 18 de la Ley sobre Normas Razonables de Trabajo, que los Estados podían proveer un salario mínimo mayor o una semana de trabajo menor que los establecidos por la Ley.

El argumento de la compañía es que, aunque no existiera conflicto entre las leyes insular y Federal, la primera ha sido suplantada porque la última ha establecido normas nacionales *uniformes* que no pueden ser menoscabadas por la ley local. Pero aparte del hecho de que como vemos más adelante al discutir la sección 18, no existen normas algunas en la Ley Federal en cuanto al día máximo de trabajo, la Ley Federal no establece normas *uniformes* de horas y salarios. Por el contrario, lo único que hace es ponerle piso a los salarios por hora y techo a la semana regular de trabajo. Los patronos pueden, y lo hacen, seguir unas normas más liberales, con el resultado de que los salarios por hora y las semanas regulares de trabajo son diversos y no uniformes.

En su consecuencia, en vista de la ausencia de una prohibición específica en la Ley Federal contra una ley local, la legislación insular que complementa la Ley Federal es válida siempre y cuando que la primera no esté sustancialmente en conflicto con la segunda. *Puerto Rico* v. *Shell Co.,* supra; *Cordero* v. *Prensa Insular de Puerto Rico, Inc.,* su-

pra; *Ávila* v. *Corte,* supra; *Latoni* v. *Corte Municipal,* supra, 149, nota 1, párrafo 2; *Irizarry* v. *Corte,* 64 D.P.R. 94; *Ballester Hermanos* v. *Tribunal de Contribuciones,* 66 D.P.R. 560, 578, nota 17, revocado por otros motivos, 162 F.2d 805 (C.C.A. 1, 1947), *cert.* denegado 332 U.S. 816; *Luce & Co.* v. *Junta Salario Mínimo,* 62 D.P.R. 452; *Sucrs. de J. Fernández* v. *Domenech, Tes.,* 60 D.P.R. 906, 912.

"¿Qué es lo que constituye tal conflicto sustancial? La Corte Suprema ha dicho que el conflicto o pugna debe ser tan directo y positivo que las dos leyes no puedan armonizarse o coexistir al mismo tiempo. *Kelly* v. *Washington,* 302 U.S. 1, 10. O dicho en otra forma, el estatuto local no debe servir de obstáculo al cumplimiento y ejecución de todos los fines y objetivos del Congreso. *Hill* v. *Florida,* supra, 542; *Hines* v. *Davidowitz,* supra, 67; *Allen-Bradley Local* v. *Board,* 315 U.S. 740, 749." *Ávila* v. *Corte,* supra, págs. 18-9.(2a)

La compañía sostiene que aquí existe ese conflicto. Aduce dos argumentos sobre este punto. El primero es que bajo la Ley Federal, procede la paga a tiempo y medio solamente si el empleado trabaja más de la semana máxima de cuarenta horas de trabajo provista en la Ley (durante el primer año de la Ley, 44 horas; durante el segundo, 42). Por otro lado, doble paga por la novena hora trabajada en cualquier día procede bajo la Ley núm. 49, no importa el número de horas trabajadas a la semana.

La Ley Federal guarda silencio sobre la cuestión de un día máximo de trabajo. No estamos convencidos de que la necesidad de cumplir con una ley local sobre esa materia cree un conflicto con la Ley Federal que provee una semana máxima de trabajo. Si la Ley insular hubiera aumentado la semana máxima de trabajo fijada por la Ley Federal, quizás tendríamos una cuestión diferente. Pero aquí el día

---

(2a) Véanse también, *Notes,* 60 *Harv.L.Rev.* 262; 61 *Harv.L.Rev.* 840 (Mayo 1948).

de trabajo del empleado puede ser fijado en ocho o nueve horas, según dispone la Ley núm. 49, sin intervenir en forma alguna con la semana de trabajo máxima de cuarenta horas de la Ley Federal. Bajo las condiciones modernas muchos negocios se han visto obligados a reajustar sus operaciones para cumplir tanto con leyes Federales como con insulares aprobadas dentro de sus respectivas esferas.

La segunda contención es que surge confusión y controversia al calcular la doble paga por la novena hora bajo la Ley núm. 49. La compañía presenta dos ejemplos: En primer lugar, al calcular la paga a tiempo y medio bajo la Ley Federal después de trabajarse la semana de cuarenta horas, ¿son las novenas horas trabajadas durante las primeras cuarenta horas incluídas a paga doble o sencilla al determinar el tipo sencillo de paga? En segundo lugar, si la novena hora es también la cuadragésimaprimera de la semana, ¿constituye la paga por la misma tiempo y medio, o el doble de tiempo y medio?

Estas preguntas tendrán que contestarse en casos adecuados. Las mismas no surgen en este caso toda vez que el demandante no reclama bajo la Ley Federal. Véase el escolio 6. Es cierto que la Ley Federal ha creado éstas y otras situaciones difíciles en cuanto a qué constituye la paga sencilla a los fines de hacer efectivo el tiempo y medio para trabajo realizado en exceso de cuarenta horas semanales. *Bay Ridge Operating Co.* v. *Aaron,* supra. Pero no podemos ver por qué eso requiere que resolvamos que las dos Leyes están en conflicto. *Cf. Ávila* v. *Corte,* supra.

Finalmente, la compañía descansa en la sección 18 de la Ley sobre Normas Razonables de Trabajo, 29 U.S.C. sec. 218, que lee en parte como sigue: "Ninguna disposición contenida en las secciones 201-19 de este título o de cualquier orden expedida bajo las mismas, será excusa para no cumplir con cualquier ley federal o estatal u ordenanza municipal que establezca un salario mínimo mayor que el sa-

lario mínimo establecido en dichas secciones o una semana de trabajo máxima menor que la establecida en tales secciones, y ninguna disposición de las secciones 201–19 de este título en relación con el empleo de menores, será justificación para no cumplir con cualquier ley federal o estatal u ordenanza municipal, que establezca una norma mayor que la establecida por dichas secciones.''

En la sección 18 el Congreso expresamente permitió la existencia de leyes locales sobre salario mínimo y semana máxima de trabajo, si éstas disponían normas más altas que las comprendidas en la Ley Federal. Según la compañía, la sección 18 excluyó por inferencia de sus términos las leyes locales que establecen un día máximo de trabajo como lo es la Ley núm. 49, que por tanto vino a ser inefectiva para empleados cubiertos por la Ley sobre Normas Razonables de Trabajo, al aprobarse esta última.

No estamos conformes con esta contención. Al aprobar la sección 18, el Congreso hizo constar claramente que no estaba apropiándose exclusivamente el campo de las normas en relación con horas y salarios en el comercio interestatal. Le concedió a los estados libertad de acción para establecer normas mayores que las comprendidas en la Ley Federal. La Ley sobre Normas Razonables de Trabajo suplanta la legislación local solamente en caso de que ésta provea normas menores que la Ley Federal. Los informes de comités son consistentes con esta interpretación de la Ley. Dichos informes aparecen citados en parte en *C.C.H. Labor Law Service*, párrafo 26,800, como sigue:

"La sección 16 de la enmienda del Comité dispone que ninguna disposición de la ley será justificación para no cumplir con cualquier otra ley federal o estatal u ordenanza municipal, que establezca un salario mínimo mayor *o un día máximo de trabajo* o semana máxima de trabajo *menores* que los establecidos bajo la ley, y ninguna disposición de la ley en relación con el empleo de menores será justificación para no cumplir con cualquier ordenanza federal, estatal

o municipal que establezca una norma mayor que la establecida por la Ley. *H. R. Rep. No.* 2182, pág. 15, abril 21, 1938, Congreso 75, Tercera Sesión.

"La sección 18 que trata de la relación de la ley con otras leyes sigue la disposición correspondiente de la enmienda de la Cámara, con la adición de una disposición al efecto de que ninguna disposición de la ley se interpretará como que es una justificación para reducir los salarios o aumentar las horas. *Conference Committee Rep. No.* 33, pág. 2738, junio 11, 1938, Congreso 75, Tercera Sesión." (Bastardillas nuestras).

El silencio que guarda la sección 18 en cuanto a las leyes estatales que proveen días máximos de trabajo no quiere decir que el Congreso tuvo la intención de suplantar tal legislación local. Por el contrario, según indica el Informe de la Cámara, tales leyes continuaron en vigor. La sección 18 no contiene referencia específica a ellas precisamente porque la Ley Federal no contiene disposición alguna en relación con un día máximo de trabajo. El Congreso creyó que era innecesario incluir una cláusula de salvedad para la legislación estatal sobre una materia que no estaba comprendida en la Ley Federal. *Cf. Luce & Co.* v. *Junta de Salario Mínimo,* supra.

Los únicos casos aplicables que hemos encontrado resuelven lo contrario. *Verdejo* v. *Bull Insular Line Inc.,* Corte de Distrito de los Estados Unidos para Puerto Rico, Civil núm. 2847, resuelto el 20 de marzo de 1943; *Butte Miners' Union No. 1* v. *Anaconda Copper Min. Co.,* 118 P.2d 148, 152-53 (Mont., 1941). No estamos conformes con el resultado de dichos casos y no los seguiremos. En *Sirmon* v. *Cron and Gracey Drilling Corporation,* 44 F.Supp. 29 (D.C., La., 1942) la corte dijo (págs. 30-31): "El Congreso se ha apropiado exclusivamente el campo de relaciones obreras en tal comercio [interestatal] y el Estado ya no tiene poder para intervenir con dicha materia." Creemos que esta manifestación era innecesaria para decidir la cues-

tión ante la corte. De cualquier modo, creemos que la afirmación citada es demasiado amplia y la consideramos errónea al aplicarla a la situación ante nos. *Cf. Divine* v. *Levy*, 45 F. Supp. 49 (Dist. Ct., La., 1942). La demandada descansa también en el caso de *Erie R. R. Co.* v. *New York*, 233 U.S. 671. Sin embargo, nada encontramos en dicho caso que nos impida llegar al resultado a que hemos llegado, especialmente a la luz de los recientes casos de la Corte Suprema que aquí citamos.

El tribunal de distrito no cometió error al resolver que al proveer un día máximo de trabajo, la Ley núm. 49, al ser aplicada a los obreros en Puerto Rico que trabajan dentro del comercio interestatal, no está en conflicto con la Ley sobre Normas Razonables de Trabajo, que dispone un salario mínimo y una semana máxima de trabajo. Por tanto, la Ley núm. 49 no fué suplantada por la Ley Federal.[2b]

## VI

■ Los señalamientos sexto, séptimo y octavo son que el tribunal inferior cometió manifiesto error al apreciar la evidencia (6) al resolver que durante el período cubierto por este pleito el demandante trabajó diez horas diarias, independientemente del trabajo de noche; (7) al resolver que el convenio existente entre las partes era el pago de cierto salario por sólo ocho horas de trabajo por el período anterior a enero 1 de 1939; y (8) al no resolver que a lo sumo el demandante tenía derecho al pago por las novenas horas trabajadas, al doble del tipo sencillo pagado por las horas de trabajo anteriores.

La sentencia contiene concesiones de $42.75 para 1935, $293.625 para 1936, y $322.875 para 1937. Estas porciones de la sentencia serán revocadas en vista de nuestra conclu-

---

[2b] *Cf.* la sección 5 y otras disposiciones de la Ley núm. 379, Leyes de Puerto Rico, 1948 ((1) pág. 1255), la cual no está envuelta aquí.

sión en la Parte III de que las reclamaciones por trabajo realizado con anterioridad a enero 1 de 1938 habían prescrito cuando la demanda se radicó el 30 de junio de 1942.

En cuanto a 1938, suponemos *argüendo,* que el sexto error no fué cometido y que la conclusión de hecho del tribunal inferior de que el demandante trabajó diez horas diarias durante 1938 es correcta. Pero el tribunal de distrito cometió el séptimo error, ya que del récord no surge evidencia sustancial alguna que justifique su conclusión adicional de que el convenio entre las partes para 1938 proveía un día de trabajo de ocho horas a pagarse a razón de $3.75.

El récord demuestra que el convenio para 1938 fué por un salario diario, independientemente del número de horas trabajadas. En su propia declaración el demandante alegó que tenía derecho a paga por el trabajo realizado en exceso de ocho horas "según la ley que había sido aprobada". No declaró que él fundaba su reclamación en cualquier convenio existente entre las partes al efecto de que el salario diario estipulado era para ocho horas de trabajo solamente. Pero como más adelante se notará, con excepción de la novena hora, la Ley núm. 49 no concede otra cosa; la paga adicional por trabajo realizado en exceso de la octava o novena hora debe pagarse a tipo sencillo solamente si existe un convenio de que el salario diario cubre únicamente ocho o nueve horas de trabajo.

En el contrainterrogatorio, el demandante reiteró su declaración de que no había convenio alguno entre las partes limitando el salario diario a ocho horas de trabajo: "P.— ¿Usted dice que hizo un cálculo para hacer la reclamación por lo que le debe la Compañía por esa cantidad? R.—Sí, señor. P.—Ahora ¿ese cálculo lo hizo usted a base de que tienen que pagarle las horas dobles, todas las horas dobles? R.—Todas no, después de las ocho horas. P.—¿A pesar de que dijo a la corte que trabajaba once horas por tres dóla-

res diarios?(³) R.—Sí, porque estaba obligado a hacerlo
debido a que la situación económica lo exigía y si no seguíamos
trabajando, hasta se cometía discrimen. P.—¿Ud. trabajaba
once, diez horas por los tres dólares? R.—Sí. P.—
¿Eso era lo que usted hacía? R.—Sí.''

El tribunal inferior llegó a la conclusión de que el convenio
entre las partes era para un día de ocho horas porque,
entre otras cosas, la compañía descansaba en la manifestación
del Comisionado del Trabajo descrita en la Parte
I al efecto de que los dependientes, como representantes
de la compañía, no estaban cubiertos por la Ley núm. 49.
Pero esa situación, si algo exige, es la conclusión opuesta:
si los dependientes no estaban sujetos a un día de ocho
horas, la compañía podía negociar con ellos para un día de
trabajo mayor.

La situación que encontramos aquí ha sido resuelta por
casos anteriores. En *Avellanet v. Porto Rican Express Co.*,
supra, dijimos a la pág. 697: ''La Ley núm. 49 dispone un
día de trabajo de ocho horas. Permite que se trabaje la
novena hora, pero exige que se pague tiempo doble por la
misma. Hemos resuelto que el trabajar después de la novena
hora, si bien prohibido so pena de penalidad criminal,
debe pagarse a tiempo sencillo. Pero la regla ha sido establecida
claramente al efecto de que de adeudarse algo
como tiempo sencillo después de la octava hora, depende del
contrato de servicios; es decir, una persona que bajo un
convenio privado entre las partes trabaje diariamente trece
horas por un sueldo estipulado por día, por semana o por
meses, ha recibido pago total bajo la Ley número 49—que
no es una ley de salario mínimo—excepción hecha de la paga

---

(³)Durante 1938 el demandante recibió $3.75 al día en vista del hecho
de que la Junta de Arbitraje le concedió a los dependientes un aumento del
25 por ciento. Pero el laudo no efectuó otros cambios, a pesar del hecho de
que los dependientes solicitaban, entre otras cosas, que se fijara su día regular
de trabajo en ocho horas—de ocho a doce de la mañana y de una a cinco
de la tarde.

adicional por la novena hora, la cual, bajo tales circunstancias, se paga a un tipo por hora calculado dividiendo la cantidad recibida por el número total de horas trabajadas para ganarla. *Cardona* v. *Corte,* 62 D.P.R. 61; *Muñoz Colón* v. *Corte,* 63 D.P.R. 236.''

En el mismo caso dijimos que (pág. 715) ''El propio querellante . . . probó que su convenio era por un sueldo [diario]. Absolutamente nada hay en el récord que justifique una resolución al efecto de que se tuvo en mente que dicho sueldo cubriría únicamente trabajo por ocho horas. De acuerdo con la Ley según está hoy día redactada,(4) el querellante por tanto recibió paga total excepto la doble paga por la novena hora.'' Y véase *García* v. *Corte,* ante, pág. 152.

En vista de los anteriores hechos y casos, el tribunal inferior cometió el séptimo error al resolver que el convenio existente entre las partes era pagar cierto salario diario por sólo ocho horas de trabajo durante 1938. Y de los mismos hechos y casos surge que el tribunal de distrito también cometió el octavo error al no resolver que a lo sumo el demandante tenía derecho por trabajo realizado durante 1938 a que se le pagara la novena hora al doble del tipo sencillo.

Pasemos ahora al problema de modificar la sentencia a la luz de nuestras anteriores conclusiones. Para 1938, la sentencia le concedió al demandante (1) $165.91 por 176½ novenas horas, calculadas a tiempo doble: $3.75, dividido por ocho horas = 47¢ × 2 = 94¢ la hora; y (2) $82.95 por 176½ décimas horas, calculadas a 47¢ la hora.

La concesión de 176½ décimas horas, ascendentes a $82.95, será eliminada, toda vez que hemos resuelto que estaba comprendida en el contrato de trabajo por $3.75 diarios. Pero según indica la cita que hemos hecho del caso de *Avellanet* a la pág. 697, el demandante tiene derecho a

---

(4)*Cf.* Ley núm. 379, Leyes de Puerto Rico, 1948 ((1) pág. 1255).

paga doble por la novena hora "la cual, bajo tales circunstancias, se paga a un tipo por hora calculado dividiendo la cantidad recibida por el número total de horas trabajadas para ganarla."

Los restantes $165.91 fueron concedidos por 176½ novenas horas entre mayo 1, 1938 y diciembre 9, 1938, al tipo doble de 94¢ la hora. No podemos convenir con esta conclusión, ya sea en cuanto al número de novenas horas trabajadas o en cuanto al tipo de paga por las novenas horas trabajadas. Pasemos primeramente a determinar el número de novenas horas trabajadas.

De conformidad con los records de la compañía entre mayo 1 y diciembre 9 de 1938, Chabrán trabajó ocho horas diarias en aproximadamente 170 días y trabajó en un número de otros días menos de ocho horas. El tribunal de distrito aparentemente concluyó que dondequiera que la compañía reportó un día de ocho horas, de hecho Chabrán trabajó diez horas. En consecuencia, le concedió 176½ novenas horas.

En relación con el sexto error, suponemos, sin decidirlo, que el día de trabajo regular del demandante era de diez horas. Pero esa cuestión no puede evadirse aquí. La compañía es una firma de importancia con cientos de empleados. Desde octubre, 1938, la Ley Federal exigía que se llevaran estos records. Y si se llevaban falsamente, tanto la compañía como sus funcionarios eran responsables criminalmente por ello, 29 U.S.C. secciones 215, 216; *United States* v. *Darby*, 312 U.S. 100, 125.

Tanto antes como después de la fecha en que entró en vigor la Ley Federal, la compañía en 1938 llevaba un récord diario del trabajo de todos sus empleados, Chabrán inclusive. Éste, lo mismo que el resto de los empleados, firmaba el recibo de nómina al terminarse cada semana, demostrativo del tiempo trabajado cada día. Tanto Chabrán como los otros empleados de esta industria pertenecían a

una poderosa unión que había ganado una huelga a principios de 1938. Es difícil creer que inmediatamente después él habría de firmar sin protesta alguna recibos de nómina que reflejaban ocho horas de trabajo y aceptar paga por solamente ocho horas si su día de trabajo regular, como cuestión de hecho, consistía de diez horas. Existe siempre la posibilidad de que algunos patronos poco escrupulosos lleven records falsos. Pero no hay el más remoto indicio en la evidencia o en las conclusiones de hecho del tribunal inferior al efecto de que la compañía demandada llevara records falsos. Y se admite que las horas regulares para entregar y recoger mercancías en los muelles de la compañía durante 1938 fueron de ocho a doce de la mañana y de una a cinco de la tarde; si era necesario trabajar extra, dicho trabajo se realizaba durante las horas de la noche y se pagaba a un tipo nocturno mayor con un mínimo por una fracción de la noche.

En verdad, el tribunal inferior aceptó en efecto los records de la compañía. Desde principios de 1938 a mayo 1 de 1938, los recibos de nómina, firmados por Chabrán, demostraban que él trabajó ocho horas diarias por las cuales recibió $3.75, calculado a base de 46 y ⅞ ¢ la hora. Por horas en exceso de ocho, los libros demuestran que recibió 62¢. La corte inferior, por consiguiente, no concedió paga por novenas horas durante este período. Tampoco le concedió novenas horas por los días en que de los records surgía que el demandante trabajó menos de ocho horas.

Pero, a pesar de que aceptó los libros de la compañía en estas ocasiones, la corte inferior aparentemente fué de opinión que el día *regular* de trabajo fué cambiado el 1ro. de mayo de 1938 de ocho horas a diez horas, porque los recibos de nómina, a partir del 1ro. de mayo, contenían un ''1'' por el tiempo trabajado por la suma de $3.75 más bien que ''8 horas'', según aparecía de los recibos de nómina de enero a mayo. Pero no vemos la importancia

que tuvo este cambio en apuntar el tiempo trabajado—8 horas—en vista del hecho de que los tipos de paga tanto para trabajo diurno como nocturno permaneció el mismo.

Dadas todas estas circunstancias, nos vemos obligados a resolver que la corte inferior cometió manifiesto error al concluir que el demandante trabajó 176½ novenas horas durante 1938. Véase *Vélez* v. *Royal Bank*, 65 D.P.R. 967. Aceptamos los records de la compañía demostrativos de que durante 1938 el demandante trabajó 68 novenas horas.

Resta determinar la cuestión sobre el tipo de paga por las novenas horas trabajadas durante 1938. Como hemos visto, el tribunal de distrito concedió $165.91 por 176½ novenas horas, calculadas al tipo doble de 94¢ la hora. Pero no tomó en consideración que el demandante ya había recibido por la novena hora paga de 62¢ la hora por horas extras trabajadas. Por consiguiente, a tenor con la Ley núm. 49, la demandada todavía le adeudaba a Chabrán por cada novena hora trabajada, solamente 32¢ la hora por 68 novenas horas, o sea, $21.76([5]) A esta última cifra, le añadimos $1.28, concedida por la corte de distrito y admitida por la compañía en relación con cuatro novenas horas trabajadas en diciembre de 1938.

La sentencia del tribunal de distrito por el período comprendido entre enero 1, 1939 y junio 30 de 1942 no presenta problema alguno, bien sea de hecho o de derecho. Ambas partes admiten que bajo el aviso mencionado en la Parte IV, durante dichos años el demandante recibió (1) un salario de $3.75 por un día regular de trabajo de ocho horas, (2) 72¢ la hora por trabajo realizado en exceso de las horas regulares de trabajo, y (3) como nueva disposición, 70¢ la hora por trabajo en exceso de la semana máxima de trabajo

---

[5] La compañía quizás pudo haber alegado que el tipo sencillo de paga por la novena hora se determina dividiendo el salario diario de $3.75 por diez horas en vez de ocho. Véase la Parte VI, discusión de los errores séptimo y octavo. Pero la compañía, consistente con su posición de que el día regular de trabajo consistió de ocho horas, usó, en beneficio del demandante, ocho en

vez de diez como el divisor, con el fin de determinar el tipo de paga sencilla para la novena hora, para conceder el doble de ese tipo sencillo por dicha hora.

[6] Las partes no argumentan la cuestión de cualquier supuesta reclamación que emane de la Ley sobre Normas Razonables de Trabajo, y no la consideramos aquí. *Cf. Avellanet* v. *Porto Rican Express Co.*, supra, págs. 701–15; *Bay Ridge Operating Co., Inc.* v. *Aaron et al.*, supra.

provista por la Ley Federal.[6]   Y el tribunal de distrito aceptó los records de la compañía demostrativos del número de novenas horas trabajadas desde 1939 a 1942.   Así vemos que por novenas horas trabajadas, el demandante recibió 62¢ la hora (o 70¢ la hora cuando el trabajo se realizó en exceso de la semana regular máxima Federal), mientras que la corte inferior correctamente resolvió que, a tenor con la Ley núm. 49 y los casos aquí citados, la compensación por estas novenas horas debió haber sido el doble del tipo sencillo; v.g., $3.75, divididos por $8 = 47¢$ la hora $\times 2 = 94¢$ cada novena hora.

Si bien la corte de distrito aceptó el número de novenas horas trabajadas según éstas aparecían de los libros de la compañía, cometió un pequeño error en las cifras para 1939 a 1942.   Supuso que las novenas horas siempre se pagaron a 62¢ la hora, mientras que la verdad es que en algunas ocasiones el demandante recibió 70¢ la hora por trabajo realizado en exceso de la semana regular de trabajo máxima Federal.   Por tanto, aceptamos la conclusión de hecho de la corte inferior en cuanto al número de novenas horas trabajadas durante el período comprendido entre 1939 a 1942, pero reajustamos la compensación para que provea así:   (1) Si el demandante recibió 62¢ la hora por la novena, tiene ahora derecho a recibir compensación adicional por ello a 32¢ la hora;   (2) si recibió 70¢, su compensación adicional por las novenas horas será 24¢ por hora.

Resta sólo indicar que el demandante trabajó 112½ novenas horas en 1939; 127½ horas en 1940; 201½ horas en 1941; 89½ desde enero 2 a junio 26 de 1942.   Por esas novenas horas debió pagársele 94¢ por hora.   En su lugar,

en la mayoría de los casos se le pagó 62¢ y en algunos 70¢. En su consecuencia, tiene derecho a recibir 32¢ o 24¢ por hora, según sea el caso, por estas novenas horas.

*Por los motivos antes expuestos, la sentencia del tribunal de distrito será modificada para que provea que el demandante recibirá, por las novenas horas trabajadas, lo siguiente: (1) 1938, $21.76 más $1.28, ó $23.04; (2) 1939, $34.76; (3) 1940, $36.76; (4) 1941, $55.80; (5) 1942, $24.99, haciendo un total de $175.35.*

El Juez Asociado Sr. De Jesús, si bien no participó en la vista de este caso, concurre en la opinión emitida.

Opinión disidente del Juez Asociado Sr. Todd, Jr., en cuanto a la Parte IV de la Opinión del Tribunal.

Disiento en cuanto a la conclusión a que se llega en relación con el cuarto señalamiento. Creo que el aviso impreso expedido por la compañía y aceptado por los empleados estableció un nuevo contrato entre las partes, especialmente para los dependientes como el demandante, ya que en cuanto a ellos se fijaron distintas condiciones de trabajo y de paga que las incluídas para el año 1938, las cuales fueron aceptadas por el demandante; y, por las razones expuestas al discutirse y resolverse el tercer error, las reclamaciones anteriores al 1 de enero de 1939, están prescritas. El *dictum* del caso de *Avellanet* no queda afectado ni es aplicable, ya que las nuevas condiciones no se refieren en su totalidad a la nueva Ley Federal.

Eliminaría, por tanto, los $23.04 correspondientes al año 1938 y concedería al demandante las sumas especificadas en la opinión para los años 1939, 1940, 1941 y 1942, que hacen un total de $152.31.