FRANCISCO AGOSTINI Y OTROS, peticionarios, v. TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE SAN JUAN, HON. J. M. ALMODÓVAR ACEVEDO, JUEZ, demandado; The PUERTO RICO LIGHTERAGE CO.. interventora.

Número 2573.

*Sometido*: 22 de abril de 1960. *Resuelto*: 7 de marzo de 1961.

*Vicente Géigel Polanco* y *Vicente Géigel Lanuza,* abogados de los peticionarios; *Hartzell, Fernández & Novas* y *Vicente M. Ydrach,* abogados de la interventora, demandada en el pleito principal.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

El día 4 de diciembre de 1958, Francisco Agostini y otros 51 querellantes presentaron en el Tribunal Superior, Sala de San Juan, una querella en reclamación de salarios por servicios prestados durante el curso de los años 1949 a 1958 inclusive, a las querelladas Puerto Rico Coal Company y The Puerto Rico Lighterage Company.

Las querelladas radicaron su contestación haciendo una negación general de los hechos alegados en la querella y levantaron, entre otras defensas afirmativas, la de que toda reclamación anterior al 3 de septiembre de 1954 estaba prescrita en cuanto a todos los querellantes.[1]

---

[1] Los fundamentos de esta defensa de prescripción los exponen las querelladas en la siguiente forma:

"II

"El día 24 de junio de 1954 todos los empleados de las querelladas declararon una huelga y desde ese día dejaron de ser empleados de las querelladas.

"III

"Desde el 25 de julio hasta el 6 de septiembre de 1954 todos los empleados de las querelladas pasaron a ser empleados de la Administración

Posteriormente ambas partes radicaron en el tribunal a quo la siguiente estipulación de hechos:

"Estipulación.—Comparecen las partes en el caso de epígrafe representadas por sus abogados que suscriben y respetuosamente someten a este Honorable Tribunal la siguiente estipulación de hechos:

"1. Los querellantes, a excepción de Francisco Agostini y de Miguel Angel Picart, han venido trabajando para una u otra de las querelladas desde en/o antes de 1949, bajo los términos y condiciones contenidas en diversos convenios colectivos de trabajo.

"2. El 9 de mayo de 1952 las querelladas suscribieron un convenio colectivo con la Unión de Empleados de Muelles de Puerto Rico el cual fue hecho retroactivo al 1º de enero de 1952 y se convino tendría fuerza y vigor hasta el 31 de diciembre de 1953, y los querellantes, a excepción de las dos personas antes mencionadas, trabajaron con la una o con la otra de las querelladas bajo los términos de dicho convenio.

"3. El día 24 de junio de 1954 ocurrió en el frente portuario en San Juan, P. R. un paro huelgario que incluyó a los querellantes.

"4. Como resultado de dicho paro huelgario el 25 de julio de 1954 la Asamblea Legislativa del Estado Libre Asociado de Puerto Rico aprobó una ley incautándose de los muelles y de la cual se solicita al Tribunal tome conocimiento judicial.

"5. El 28 de julio de 1954 el Honorable Gobernador de Puerto Rico de acuerdo con la autoridad que le confiriera dicha ley se incautó de dichas facilidades portuarias.

---

de Emergencia de Muelles, una organización creada por la Ley Núm. 1 aprobada por la Asamblea Legislativa de Puerto Rico el 25 de julio de 1954.

"IV

"El 3 de septiembre de 1954 las querelladas celebraron un convenio con los querellantes y a virtud de dicho convenio se comenzó una nueva relación de empleado y patrono.

"V

"El convenio suscrito el 3 de septiembre de 1954 con la Unión de Empleados de Muelles de Puerto Rico constituye un nuevo contrato de trabajo de acuerdo con los términos del Artículo 1867 del Código Civil de Puerto Rico y con lo resuelto por el Tribunal Supremo en el caso de Chabrán v. Bull Insular Lines, Inc., 69 D.P.R. 269 y por lo tanto toda reclamación anterior al 3 de septiembre de 1954 está prescrita en cuanto a todos los querellantes."

"6. Bajo los términos de dicha ley el Gobernador de Puerto Rico designó al señor Salvador V. Caro, Administrador de Emergencias de los Muelles de Puerto Rico. Este, a su vez, designó representantes suyos en los diversos muelles incluyendo un representante que designó para hacerse cargo de las opera· ciones de The Porto Rico Lighterage Co. y de The Porto Rico Coal Co.

"7. Durante el período de incautación por la Administración de Emergencia de Muelles, ésta continuó utilizando el mismo personal que empleaban las querelladas incluyendo los querellantes; la Administración de Emergencia de Muelles pagaba los gastos de operación de un fondo especial creado por la ley antes mencionada, y una vez hechos esos pagos la Administración de Muelles facturaba a las querelladas por los gastos incurridos en relación con tales operaciones sometiendo las facturas; las querelladas a su vez pagaban a la Administración el importe de las facturas correspondientes. La Administración pagaba los salarios de los empleados de las querelladas incluyendo los salarios de los querellantes y luego las querelladas le reembolsaban el importe de dichos pagos.

"8. El día 3 de septiembre de 1954 se celebró un convenio entre la Unión de Empleados de Muelles de Puerto Rico, Local 24927 de la American Federation of Labor con varias compañías, dos de las cuales eran las querelladas y que en aquel convenio estuvieron representadas por la Puerto Rico Steamship Association conviniendo las condiciones de empleo y salarios de los querellantes, a excepción de Francisco Agostini y Miguel Angel Picart, al cual convenio se le dio efecto retroactivo al 1º de enero de 1954 y continuaría en fuerza y vigor hasta el 30 de septiembre de 1956 a excepción de las cláusulas relativas a salario."

Con fecha 23 de septiembre de 1960 el Tribunal Superior dictó la siguiente

"Resolución.—Vista la estipulación de 11 de septiembre de 1959, la demanda y la contestación, se declara con lugar la defensa especial de prescripción alegada por la parte querellada, por los mismos fundamentos expuestos en nuestra resolución en el caso de Félix Hernández, et al, demandantes, vs. Puerto Rico Steamship Association, et al, civil número 57-2580, y en tal

virtud el tribunal resuelve que está prescrita toda reclamación por el período comprendido con anterioridad al 24 de junio de 1954, fecha en que todos los empleados de la querellada declararon una huelga y desde ese día dejaron de ser empleados de dicha querellada."

Para revisar esa resolución expedimos un auto de certiorari.

Los peticionarios imputan al tribunal a quo la comisión de tres errores, a saber: (1) Haber declarado prescrita toda reclamación anterior al 24 de junio de 1954 por el fundamento de que en esa fecha los querellantes declararon una huelga y desde ese día dejaron de ser empleados de las querelladas; (2) Haber apoyado su criterio en lo resuelto por este Tribunal en el caso de *Chabrán* v. *Bull Insular Line*, 69 D.P.R. 269; y (3) No haber aplicado para resolver este caso las disposiciones contenidas en las secciones 32 y 34 de la nueva Ley de Salario Mínimo aprobada el 26 de junio de 1956.

■ Los dos primeros errores nos llevan a examinar el estado de nuestra jurisprudencia, antes de regir la Ley de Salario Mínimo de 1956, en materia de prescripción de las acciones para el cumplimiento de las obligaciones de pagar a los obreros el importe de sus servicios.

La prescripción de estas acciones se regía por el artículo 1867 del Código Civil (Ed. 1930),—31 L.P.R.A., sec. 5297 —que en lo pertinente dispone:

"Artículo 1867. Por el transcurso de tres años prescriben las acciones para el cumplimiento de las obligaciones siguientes:

"1. . . . . . . . .

"2. . . . . . . . .

"3. La de pagar a los menestrales, criados y jornaleros el importe de sus servicios, y de los suministros o desembolsos que hubiesen hecho, concernientes a los mismos.

"4. . . . . . . . .

"El tiempo para la prescripción de las acciones a que se refieren los tres párrafos anteriores se contará desde que dejaron de prestarse los respectivos servicios."

¿Cómo hemos determinado el inicio del término prescriptivo de tres años de las acciones mencionadas en el apartado 3 arriba copiado? Interpretando la frase "desde que dejaron de prestarse los respectivos servicios", nuestra jurisprudencia ha contemplado las siguientes situaciones determinativas del inicio de dicho término: (1) cuando ocurre un cambio sustancial en la naturaleza de los servicios prestados por el obrero; (2) cuando el obrero abandona su trabajo sin ofrecer una explicación para ello, aun cuando el patrono lo vuelva a emplear; y, (3) cuando el obrero se declara en huelga, la gana y firma un nuevo contrato con el mismo patrono, conteniendo el nuevo contrato cambios sustanciales en las condiciones de trabajo.

En *Muñoz* v. *Corte*, 63 D.P.R. 236, el obrero prestó los mismos servicios al patrono ininterrumpidamente desde junio 20 de 1936 hasta el 18 de noviembre de 1940, fecha ésta en que dejó de prestar dichos servicios. Radicó su querella en cobro de salarios el día 10 de diciembre de 1940. Este Tribunal rechazó la contención del patrono de que la acción en cobro de los servicios prestados por el obrero antes del 10 de diciembre de 1939, estaba prescrita. Dijimos que, la frase "desde que dejaron de prestarse los respectivos servicios" no puede significar otra cosa sino que la prescripción en este caso empezó a correr desde el 18 de noviembre de 1940, que fue cuando el obrero dejó de prestar sus servicios al patrono. En reconsideración expusimos que el artículo 1867 de nuestro Código Civil debe interpretarse de conformidad con sus propios términos, considerados a la luz de su historia legislativa. Dicho artículo es equivalente al 1967 del Código Civil Español que tiene su génesis en la Ley 10, Título II, Libro 10 de la Novísima Recopilación, dispositiva de que la acción para cobrar lo adeudado a sirvientes y menestrales por concepto de servicios prestados debía establecerse "dentro de tres años después que fueran despedidos de los tales señores", a menos que se probase que la prescripción había sido interrumpida

por requerimiento de cobro hecho dentro de dicho período. Se aducía como razón de este precepto la enorme desventaja en que se encontraba el obrero frente a su patrono en el siglo dieciséis; que el obrero no se atrevería a demandar a su señor, sin riesgo de perder su empleo y que por eso se fijó un período de tres años a partir de la fecha en que el obrero hubiese quedado libre de la influencia de su señor. Agregamos entonces que al aprobarse en el Siglo 19 el Código Civil Español sus autores se dieron cuenta de que al variar la naturaleza de los servicios que venía prestando el obrero, se operaba una novación que extinguía el contrato anterior para dar paso a un nuevo contrato. Estas consideraciones sin duda los movieron a restringir el alcance de la ley de la Novísima Recopilación, de suerte que el período prescriptivo se contase a partir de la terminación de cada contrato sin tener en cuenta que el obrero continuase al servicio del mismo patrono, y llevando a cabo su propósito dispusieron en el último párrafo del artículo 1967 del Código Civil que el tiempo para la prescripción de estas acciones se contará desde que dejaron de prestarse los *respectivos servicios*.

En *Avellanet* v. *P. R. Express Co.*, 64 D.P.R. 693, resolvimos que los autos del caso demostraban, no que los servicios prestados por el reclamante fueron de naturaleza diferente y sí que él continuó haciendo exactamente el mismo trabajo que siempre había hecho y que por lo tanto, su reclamación no estaba prescrita bajo el artículo 1867 del Código Civil, y que para computar la prescripción de tres años que proveía dicho artículo, a partir desde que se dejaron de prestar los respectivos servicios, debía haber, por lo menos, un cambio efectivo en el trabajo realizado por el obrero. La contención del patrono era que el obrero trabajó desde 1927 hasta octubre 24 de 1938 en el recibo y despacho de carga local y que luego trabajó en otra clase de carga, presumiblemente del comercio interestatal. El Tribunal consideró que el obrero continuó haciendo el mismo trabajo y que en su consecuencia no se operó una novación en el 1938.

En *Jiménez* v. *Corte*, 65 D.P.R. 37, resolvimos que el obrero que abandona su trabajo por meses o años en una industria que funciona todo el año sin ofrecer una explicación para ello, cesa desde ese momento de rendirle servicios al patrono dentro del significado del art. 1867 del Código Civil, a los efectos del término prescriptivo de cualquier reclamación por los que hasta ese momento prestara, aun cuando luego el mismo patrono lo vuelva a emplear. Dijimos además que acontecimientos tales como una breve enfermedad del obrero, rotura de la maquinaria o escasez temporal de trabajo, no darían lugar a este resultado. Una mera ausencia del trabajo por un limitado número de días por parte del obrero con prueba aportada por éste en cuanto a la causa que motivó la ausencia, no constituiría el cese de la prestación de servicios contemplados por la ley.

En *Valiente & Cía.* v. *Corte*, 68 D.P.R. 529, ratificamos la doctrina del caso de *Jiménez* respecto a la terminación de los servicios del obrero por ausencia inexplicada de su trabajo.

Posteriormente resolvimos el caso de *Chabrán* v. *Bull Insular Line*, 69 D.P.R. 269. Veamos sus hechos.

En 3 de enero de 1938 los empleados de las compañías navieras declararon una huelga. El 10 de febrero de dicho año los obreros y las compañías navieras firmaron un acuerdo de someter la controversia a una Junta de Arbitraje, retornando los obreros al trabajo el 12 de febrero. El 26 de mayo de 1938, la Junta de Arbitraje emitió una opinión y un laudo que disponía que el laudo tendría el mismo efecto de un convenio colectivo, por el término de un año desde el primero de enero al 3 de diciembre de 1938, entre las compañías y los obreros envueltos, con el mismo resultado que si las partes hubieran otorgado tal convenio el primero de enero de 1938. Ambas partes aceptaron el laudo. Resolvimos que al tratarse el laudo de arbitraje como un convenio colectivo por un año, era completamente un nuevo arreglo entre la com-

pañía y sus empleados, que puso fin a todos los arreglos existentes y dio comienzo a un nuevo período de servicios. Toda vez que el nuevo contrato empezó a regir el primero de enero de 1938, el término prescriptivo empezó a correr en dicha fecha para reclamaciones por trabajo realizado antes de dicho día.

A la página 282, dijimos:

"En este caso la explicación para la interrupción de los servicios fue una huelga de seis semanas y un nuevo contrato, conteniendo nuevas condiciones de trabajo y de salario para toda la industria. Pero ésta no es la clase de 'explicación' contemplada por el caso de *Jiménez*, donde la enfermedad del obrero, la rotura de la maquinaria, o la escasez temporal de trabajo se muestran como ejemplos de las explicaciones suficientes para impedir la prescripción. Ninguno de estos ejemplos envuelve acción voluntaria por parte del empleado. Aquí Chabrán voluntariamente dejó el empleo de la demandada porque no estaba conforme con los términos de su empleo. Luego de transcurrido mes y medio, retornó a su trabajo bajo un nuevo contrato. Es cierto que en su caso específico el único cambio efectuado fue un aumento en su salario de un 25 por ciento. Pero el nuevo contrato realizó un número de cambios sustanciales en las condiciones de trabajo de los empleados y funcionamiento de la industria. La combinación de la interrupción de servicios durante mes y medio y del nuevo contrato nos convencen de que en este caso específico el término prescriptivo, en virtud del lenguaje que acabamos de citar de los casos de *Muñoz* y de *Jiménez*, empezó a correr desde el 1ro. de enero de 1938, fecha del nuevo contrato, por reclamaciones de trabajo realizado con anterioridad a dicha fecha."

En la página 283, agregamos:

"Chabrán alega y la corte de distrito así lo resolvió, que el estimar la interrupción de los servicios causada por una huelga como que da comienzo al período prescriptivo, sería menoscabar el derecho de huelga. No estamos conformes. En primer lugar, notamos que bajo los hechos de este caso el nuevo contrato, junto a la interrupción causada por la huelga, más bien que ésta sola-

mente, comenzó el término prescriptivo. Pero lo más importante es que no encontramos incompatibilidad entre el derecho de huelga y la regla que aquí establecemos."

Y a la página 286, dijimos:

"...El derecho de huelga no tiene relación alguna con el artículo 1867. Los empleados pueden declararse en huelga. Pero si lo hacen y ganan la huelga, obteniendo con ello un nuevo contrato de servicios, no procede la contención de que los servicios anteriores no fueron terminados. El artículo 1867 de su faz se aplica a aquellos hechos y prescribe reclamaciones por trabajo realizado con anterioridad a un nuevo contrato otorgado bajo estas circunstancias. ..."

En *Vicenty* v. *Corona Brewing Corporation*, 73 D.P.R. 135 y en *Sierra* v. *Mario Mercado e Hijos*, 81 D.P.R. 314, ratificamos nuevamente la doctrina de la novación del contrato por motivos de cambios sustanciales en la naturaleza de los servicios prestados por el obrero, sin tener en cuenta el hecho de que éste continúe al servicio del mismo patrono.

En *Berríos* v. *Eastern Sugar Associates*, 79 D.P.R. 688, resolvimos que cuando un obrero cesa en su trabajo y posteriormente vuelve a trabajar en un nuevo empleo el período de prescripción de 3 años empieza a correr desde que cesó en el primer empleo.

Nuestra jurisprudencia determina, pues, que el obrero deja de prestar los respectivos servicios (1) cuando cesa de trabajar para su patrono, (2) cuando interrumpe sus servicios por un período de tiempo sin explicación para ello aunque el patrono lo vuelva a emplear, y (3) cuando sin dejar de trabajar para el patrono se opera una novación del contrato por motivos de cambios sustanciales en la naturaleza de los servicios que el obrero venía prestándole.

 Los peticionarios-querellantes sostienen que la prescripción de sus acciones se rige por la nueva Ley de Salario Mínimo de 1956 y que habiendo esta ley instituido un nuevo concepto de la prescripción en materia de reclamaciones

de salario, no se aplica a su caso el artículo 1867 del Código Civil ni la jurisprudencia que lo interpreta, incluyendo el caso de *Chabrán*, supra. Por el contrario, las querelladas sostienen que (1) la doctrina del caso de *Chabrán* es aplicable al caso de los peticionarios y decide en contra de éstos la cuestión debatida, y (2) las reclamaciones de los querellantes estarían prescritas por haber mediado el hecho de la incautación de los muelles por el gobierno del Estado Libre Asociado, independientemente de la doctrina del caso de *Chabrán*.

La Ley de Salario Mínimo de 1956 [29 L.P.R.A., Sup. Acum. 1958, sec. 245 y siguientes] dispone en materia de prescripción de la acción en reclamación de salarios, lo siguiente:

"§246d. Término de prescripción

"(*a*) Por el transcurso de tres años prescribirá la acción en reclamación de salarios que pueda tener un empleado contra su patrono al amparo de las secs. 245 a 246m de este título, de los decretos mandatorios ya aprobados o que se aprueben de acuerdo con sus disposiciones, de las órdenes promulgadas por la Junta, o al amparo de cualquier contrato o ley. Para la prescripción de esta acción el tiempo se contará desde que el empleado cesó en su empleo con el patrono.

"(*b*) Cuando el empleado estuviere trabajando con el patrono, la reclamación solamente incluirá los salarios a que tuviere derecho el empleado, por cualquier concepto, durante los últimos diez años anteriores a la fecha en que estableciere la acción judicial.

"(*c*) En el caso de que el empleado hubiere cesado en su empleo con el patrono, la reclamación solamente incluirá los últimos diez años anteriores a la fecha de su cesantía.

"(*d*) En relación con el término prescriptivo provisto en esta sección, un cambio en la naturaleza de las labores del empleado no constituirá una novación del contrato de empleo.

"(*e*) Lo dispuesto en esta sección en nada afectará los casos ya radicados en los tribunales o que se radicaren dentro de un (1) año después de entrar en vigor las secs. 245 a 246m de este título.—Junio 26, 1956, Núm. 96, p. 623, sec. 32." (29 L.P.R.A., Sup. 1958, p. 109.)

Como la querella en este caso se radicó el día 4 de diciembre de 1958, cuando ya hacía más de un año que estaba en vigor la Ley de Salario Mínimo—Ley Núm. 96 de 26 de junio de 1956—la prescripción de la acción de los querellantes se rige por esta nueva ley y no por el artículo 1867 del Código Civil. La Legislatura tenía facultad para modificar dicho término prescriptivo. *Morales* v. *Federal Land Bank*, 56 D.P.R. 859. Por otro lado, cuando entró en vigor la nueva Ley de Salario Mínimo, aún no había transcurrido el término prescriptivo de 3 años que tenían los querellantes para ejercitar su acción, aun aceptando que bajo la teoría del caso de *Chabrán*, los querellantes dejaron de prestar los respectivos servicios a las querelladas en 3 de septiembre de 1954, fecha del nuevo convenio, o en 24 de junio del mismo año, fecha del inicio de la huelga.

■ Las querelladas admiten que la sección 32 (*a*) de la nueva Ley de Salario Mínimo cambió la doctrina judicial sobre prescripción enunciada en los casos de *Avellanet* v. *Porto Rican Express Co.*, supra, y *Vicenty* v. *Corona Brewing Corporation*, supra, y que así se hizo constar expresamente en el Informe de la Comisión Conjunta (de la Asamblea Legislativa de Puerto Rico) sobre Salario Mínimo que recomendó el proyecto (P. del S. 803) que culminó en la Ley de Salario Mínimo de 1956. En efecto, en dicho informe se hace constar:

"El apartado (*d*) expresa que a los efectos de determinar el período de cinco años (léase 10 años) fijados en los incisos (*b*) y (*c*), un cambio en la naturaleza de las labores del empleado no constituirá una novación del contrato de empleo. *El efecto de esta disposición es significativo por cuanto varía la doctrina judicial vigente relativa a la prescripción* (*Avellanet* vs. *Porto Rican Express Co.*, 64 D.P.R. 693 (1945); *Vicenty* vs. *Corona Brewing Corporation*, 73 D.P.R. 135 (1952)." (Alegato de los peticionarios, pág. 10.)

■ Las querelladas sostienen, sin embargo, que la citada sección 32 no varió la doctrina del caso de *Chabrán*. No estamos conformes. En el caso de *Vicenty* v. *Corona Brewing Corporation*, supra, dijimos:

"Interpretando el alcance del inciso 3 del artículo 1867 del Código Civil, supra, hemos resuelto que el término de tres años que el mismo provee debe contarse desde la fecha en que dejaron de prestarse los respectivos servicios, siendo uno de los casos en que así ocurre, según dijimos en *Muñoz* v. *Corte*, 63 D.P.R. 236, 248, cuando 'al variar la naturaleza de los servicios que venía prestando el obrero, se operaba una novación que extinguía el contrato anterior para dar paso a un nuevo contrato . . . de suerte que el período prescriptivo se contase a partir de la terminación de cada contrato sin tener en cuenta que el obrero continuase al servicio del mismo patrono'. Al mismo efecto véanse *Avellanet* v. *Porto Rican Express Co.*, 64 D.P.R. 693; *Jiménez* v. *Corte*, 65 D.P.R. 37; *Valiente & Cía.* v. *Corte*, 68 D.P.R. 529; *Chabrán* v. *Bull Insular Line*, supra." 73 D.P.R. 135, 144.

En este caso citamos el de *Chabrán*, como uno en el cual estaba envuelta la doctrina de la novación por variación en la naturaleza de los servicios que venía prestando el obrero. En efecto, en *Chabrán* resolvimos que toda vez que el nuevo contrato empezó a regir el primero de enero de 1938, el término prescriptivo empezó a correr en dicha fecha para reclamaciones por trabajo realizado antes de dicho día. La teoría de esta decisión era que el nuevo arreglo entre la compañía y sus empleados puso fin a todos los arreglos existentes y dio comienzo a un nuevo período de servicios. Es verdad que en el caso de *Chabrán* usamos algún lenguaje susceptible de ser interpretado en el sentido de que los respectivos servicios del obrero terminan cuando éste se declara en huelga. Así por ejemplo dijimos, a la pág. 283, que el estimar la interrupción de los servicios causada por una huelga como que da comienzo al período prescriptivo, no sería menoscabar el derecho de huelga y agregamos a la página 286 que el derecho a la huelga no tiene relación alguna con el artículo 1867; que los empleados pueden declararse en huelga; pero si lo hacen y ganan la huelga, obteniendo con ello un nuevo contrato de servicios, no procede la contención de que los servicios anteriores no fueron terminados. Hicimos claro

sin embargo, a la pág. 283, que bajo los hechos de aquel caso, el nuevo contrato, junto a la interrupción causada por la huelga, más bien que ésta solamente, comenzó el término prescriptivo. Como consecuencia, se fijó la fecha del nuevo contrato y no la de la declaración de huelga, como el inicio del período prescriptivo. Es insostenible, por lo tanto, que en el caso de *Chabrán* no estaba envuelta la doctrina de la novación del contrato, que como hemos visto, fue variada por la sección 32 (*d*) de la Ley de Salario Mínimo de 1956. Aun en el supuesto de que bajo la jurisprudencia interpretando el artículo 1867 del Código Civil pudiera sostenerse que con el inicio de una huelga el obrero cesa de prestar los respectivos servicios a su patrono, y comienza desde ese momento a correr el período prescriptivo, tal doctrina ha dejado de tener eficacia jurídica en virtud de lo dispuesto en la Ley de Salario Mínimo de 1956. En efecto, en la sección 32 (*d*) de dicha ley se sustituyó la frase *"desde que dejaron de prestarse los respectivos servicios"* que es el lenguaje usado en el artículo 1867 del Código Civil por la frase *"desde que el empleado cesó en su empleo con el patrono"*. La huelga ocasiona una interrupción en los servicios que el obrero presta al patrono pero no ocasiona la cesantía en su empleo. El derecho de huelga es un instrumento eficaz que nuestra Constitución ha puesto a disposición de los trabajadores y de sus uniones para procurarse mejores condiciones de trabajo y para lograr un más alto nivel de vida cuando el patrono se niega a acceder a sus demandas. Si interpretáramos la ley en el sentido de que el empleado que se declara en huelga cesa en su empleo con el patrono nos parece que en alguna forma, estaríamos restringiendo, aminorando o menoscabando el derecho a la huelga. Por lo menos uno de los efectos de tal interpretación sería señalar el inicio de la huelga como el momento desde el cual comienza a correr el término prescriptivo para ejercitar las acciones en reclamación de salarios. Esto quiere decir que el derecho de huelga dejaría de ser un derecho si es que

se va a interpretar como que no tiene otro alcance que el cese del obrero en su empleo con el patrono. No debe olvidarse que junto al derecho de huelga está el derecho de los trabajadores a establecer piquetes, y el principio de la negociación colectiva. Con el propósito de proteger estos derechos, la Legislatura dispuso en la sección 34 de la Ley de Salario Mínimo, lo siguiente:

"§246f. Derecho de huelga y de contratación colectiva

"Nada de lo contenido en las secs. 245 a 246m de este título autorizará a los oficiales del gobierno o a los tribunales de justicia a interpretarlas en el sentido de restringir, coartar, aminorar o en cualquier forma menoscabar el derecho a la huelga y a establecer piquetes que tienen los trabajadores para procurarse un mejor bienestar económico, ni el principio de la contratación colectiva.—Junio 26, 1956, Núm. 96, p. 623, sec. 34." (29 L.P.R.A., Sup. 1958, pág. 110.)

Concluimos, en su consecuencia, que de conformidad con las disposiciones de la nueva Ley de Salario Mínimo de 1956, ni la interrupción de los servicios prestados por el obrero causada por una huelga, ni la firma de un nuevo contrato, ni la combinación de ambos hechos, dan comienzo al término prescriptivo.

■ Lo dicho sería suficiente para disponer del caso, a no ser porque las querelladas descansan en el hecho adicional de que en el período que medió entre el inicio de la huelga y la firma del nuevo contrato con ellas, los peticionarios trabajaron para otro patrono, el Estado Libre Asociado de Puerto Rico. Sostienen la posición de que cuando el Gobierno se incautó de las facilidades portuarias en virtud de lo dispuesto en la Ley Núm. 1 de 25 de julio de 1954, se estableció de hecho y de derecho una relación de patrono y empleado entre la Administración de Emergencia de Muelles y los trabajadores y que en su consecuencia, éstos *cesaron en su empleo* con dichas querelladas.

No podemos convenir con las querelladas recurridas. La incautación y operación de las facilidades portuarias por la

Administración de Emergencia de Muelles hasta que los trabajadores en huelga y las compañías firmaron un nuevo convenio en 3 de septiembre de 1954, no produjo la cesantía de los trabajadores en su trabajo con dichas querelladas por razón, según éstas alegan, de haber ellos trabajado para otro patrono, o sea, el Gobierno del Estado Libre Asociado. El debate que se produjo en nuestra Legislatura, mientras se discutía el proyecto que se convirtió en la Ley número 1 de 25 de julio de 1954, es de muy poca ayuda para determinar si el gobierno se convirtió en patrono de los huelguistas y que en su consecuencia, éstos cesaron de ser empleados de las querelladas. Si bien es cierto que algunos legisladores expresaron el criterio de que el gobierno se convertía en patrono durante su incautación y operación de las facilidades portuarias, no es menos cierto también que otros legisladores expresaron un criterio contrario.(²) El contexto de la propia ley, su propósito y la forma en que se le dio efectividad, nos convencen de que los trabajadores en huelga no cesaron en su empleo con las querelladas al producirse la incautación y operación de las facilidades portuarias por la Administración de Emergencia de Muelles. Esta incautación y operación fue una simple intervención del gobierno fundada en razones de orden público. Su duración se extendió hasta que las querelladas y las otras compañías, después de continuar las negociaciones, llegaron a un acuerdo y firmaron un nuevo convenio con sus empleados en huelga. Recuérdese que los salarios pagados por la Administración de Emergencia de Muelles a los trabajadores, incluyendo a los querellantes, eran facturados a las querelladas y luego éstas le reembolsaban a la Administración el importe de dichos pagos. Pero aun más, hay un hecho de indudable relevancia y de gran peso en la decisión de esta cuestión. Al convenio celebrado el día 3 de septiembre de 1954 conviniendo las condiciones de empleo

---

(²) Véase Diario de Sesiones de la Asamblea Legislativa (1954), Vol. V, páginas 18 y siguientes.

y salarios de los querellantes, a excepción de Francisco Agostini y Miguel Angel Picart, se le dio efecto retroactivo al primero de enero de 1954 y continuaría en fuerza y vigor hasta el 30 de septiembre de 1956 a excepción de las cláusulas relativas a salarios. De suerte pues que el nuevo convenio cubría un período de tiempo a partir del primero de enero de 1954 y hasta 1956 y por ende, cubría el período de emergencia durante el cual el gobierno operó las facilidades portuarias. No vemos como pueda válidamente sostenerse que los querellantes cesaron en sus empleos con las querelladas por razón de haber trabajado durante la emergencia decretada por la legislatura.

*Por las razones expuestas se anulará la resolución dictada en 23 de septiembre de 1959 por la Sala de San Juan del Tribunal Superior y se devolverá el caso para ulteriores procedimientos no incompatibles con esta opinión.*